Mark J. Astarita (N.J. Bar No. 028791981)
**SALLAH ASTARITA & COX**
60 Pompton Ave
Verona, NJ 07044
Telephone: (973) 559-5566

Daniel B. Centner (*pro hac vice* forthcoming)
Grace A.Van Hancock (*pro hac vice* forthcoming)
**PEIFFER WOLF**
1519 Robert C. Blakes Sr. Drive,
New Orleans, Louisiana 70130
Telephone: (504) 605-2235

Scott L. Silver (*pro hac vice* forthcoming)
Ryan A. Schwamm (*pro hac vice* forthcoming)
Peter M. Spett, Of Counsel (*pro hac vice* forthcoming)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone: (954) 755-4799

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREA KNOLL, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff,* | |
| v. | |
| TD BANK, N.A., | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiff Andrea Knoll, an individual whose post office address is 1459 San Charles Drive, Dunedin, Florida 34698, individually and on behalf of all others similarly situated, hereby files this Class Action Complaint against Defendant TD Bank, N.A., a financial services company whose principal place of business is 1701 Route 70 East, Cherry Hill, New Jersey 08003. Plaintiff alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

## NATURE OF THE ACTION

1.      National Realty Investment Advisors LLC ("NRIA") was formed as a real estate investment, management, and development firm in 2006. NRIA began offering investment opportunities to the retail public in or around 2016, and substantially increased its fundraising efforts in or around 2018 through a nationwide advertising campaign that solicited investors to participate in opportunities to purchase, finance, and co-develop real estate.

2.      From February 2018 until January 2022, NRIA raised approximately $650 million from more than 2,000 investors.

3.      Among NRIA's various LLCs was NRIA Partners Portfolio Fund I LLC (the "NRIA Fund"), which was NRIA's primary investment vehicle. In October 2022, the Unites States Securities and Exchange Commission ("SEC") filed a civil enforcement action against NRIA and its principals alleging, amongst other misconduct, that they "knowingly and recklessly engaged in a Ponzi-like scheme." *See SEC v. NRIA, et al.*, Case No. 22-cv-06066 (D.N.J., Complaint filed Oct. 13, 2022). The SEC's action was accompanied by other criminal, civil, and regulatory actions discussed in more detail herein.

4.      Defendant TD Bank, N.A. ("TD Bank") was integral to the operation of NRIA's scheme.  Specifically, and as set forth herein, TD Bank was NRIA's primary banking institution.  As such, TD Bank was responsible for the receipt of investor deposits and the disbursement of monthly distributions, TD Bank knew its NRIA accountholders and their backgrounds by way of TD Bank's obligations to know its customers and monitor their activity, and TD Bank became intimately familiar with its NRIA accountholders by virtue of a multi-year, multi-million-dollar banking relationship that also included TD Bank's review of at least one loan application (during which an NRIA principal submitted forged documents to TD Bank).

5.      NRIA funneled much of its business through a single TD Bank account ending in 1872 (the "1872 Account").  The 1872 account was funded primarily with investor funds.  By virtue of TD Bank's facilitation of transactions in this account, TD Bank gained an intimate understanding (to the extent not learned from other sources) of NRIA's suspicious, improper, and unlawful uses of investor funds, which included frequent negative balances, substantial payments to insiders, self-dealing transactions, a lack of discernable revenue, amongst other things described herein.

6.      NRIA's scheme ultimately and unsurprisingly collapsed, causing its investors to suffer substantial losses.  On June 7, 2022, NRIA and affiliated companies filed for Chapter 11 bankruptcy protection. *In re: National Realty Investment Advisors, LLC*, Case No. 22-bk-14539 (Bankr. D.N.J., Petition filed June 7, 2022).

## TD BANK'S REGULATORY AND COMPLIANCE OBLIGATIONS

7.      TD Bank is obligated to know its customers and monitor their accounts for suspicious activity and to maintain internal control systems to prevent bank services from being misused to carry out illegal activity, particularly financial fraud and money laundering.

8.     In connection with such obligations, TD Bank employs sophisticated electronic monitoring systems to identify banking transactions or patterns that raise "red flags" that are indicative of potentially improper or illegal activity.

9.     Federal law requires banks to know their customers and understand their customers' banking behavior.  *See* 31 C.F.R. §§ 1020.220(a)(1), (2).  In accordance therewith, banks are required to collect information about the holder of each account.  When an entity opens an account, the bank must obtain information not just concerning the entity, but concerning the individuals who control it.

10.     Federal regulations, including 12 C.F.R. § 21.21, require TD Bank to develop, administer, and maintain a program to ensure compliance with federal Anti-Money-Laundering ("AML") laws.  The program must be approved by the bank's board of directors and must: (1) provide for a system of internal controls to ensure compliance at all times, (2) provide for independent testing of the bank's ongoing compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

11.     TD Bank also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

12.     TD Bank's customer due diligence programs must be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention TD Bank pays.  Where a customer is determined to be high risk, TD Bank must gather additional information about

4

the customer and its accounts, including determining: (1) the purpose of the account; (2) the source of the funds; (3) the proximity of the customer's residence to the bank; and (4) explanations for changes in account activity.

13.     TD Bank must also designate a compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with federal AML laws. The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day compliance.

14.     TD Bank also receives guidance from the Federal Financial Institutions Examination Council ("FFIEC"), which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct. Examples of these suspicious indicia relevant to the allegations in the instant case include, but are not limited to:

    a.  "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

    b.  "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

    c.  "Unusual use of trust funds in business transactions or other financial activity."

    d.  "A large volume of . . . funds transfers is deposited into . . . an account when the nature of the accountholder's business would not appear to justify such activity."

    e.  A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

    f.  "Goods or services purchased by the business do not match the customer's stated line of business . . . [or the] profile of the company provided by respondent bank or character of the financial activity; a company references remarkably dissimilar goods and services in related funds transfers; explanation given by foreign respondent bank is inconsistent with observed funds transfer activity."

    g.  "The stated occupation of the customer is not commensurate with the type or level of activity."

h.  "Customer makes high value transactions not commensurate with the customer's known incomes."

i.  "Payments or receipts with no apparent links to legitimate contracts, goods or services are received."

j.  "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

k.  "Funds transfers contain limited content and lack related party information."

l.  "A bank is unable to obtain sufficient information or information is unavailable to positively identify originators or beneficiaries of accounts or other banking activity (using internet, commercial database searches, or direct inquiries to a respondent bank)."

m.  "Funds transfers are sent or received from the same person to or from different accounts."

n.  "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

o.  "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

p.  "Purpose of shell company is unknown or unclear."

q.  "Funds are sent or received via international transfers from or to higher-risk locations."

15.    Consistent with FFIEC guidance, TD Bank maintains a system of controls sufficient to identify broad patterns, sometimes across multiple accounts.  The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities are all subject to examination.

16.    TD Bank contextualizes its scrutiny, analyzing suspicious activity against the backdrop of industry norms, as well as the customers' own backgrounds.  TD Bank is expected to use sources of information like the internet, commercial database searches, and direct inquiries to

a respondent bank, to ascertain the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

17.    TD Bank collects and maintains information about its customers and their banking behaviors in order to, among other things, detect and prevent money laundering and fraud and to protect itself from third party liability and reputational harm.

18.    TD Bank maintains procedures to know the identity of each customer and to collect information about the holder of each account. 31 C.F.R. §§ 1020.220(a)(1), (2).  When an entity rather than an individual opens an account, the bank obtains information about the individual with control of the account. *Id.*

19.    The information that TD Bank collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account, where the customer expects to transact business, and the products and services commonly used by the customer.

20.    Using the information collected, as well as external resources like internet search engines and public and commercial record databases, TD Bank creates an initial client profile and assigns a compliance-related risk rating.  Neither the profile, nor the risk rating, is final or static. When TD Bank becomes aware that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating.  One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account.

21.    TD Bank also maintains internal controls to ensure ongoing compliance with federal AML law.  These include independent testing of the bank's compliance, regular monitoring

of compliance, and training of personnel.  These controls also include customer due diligence programs to prevent and detect money laundering.

22.    Through these programs, TD Bank obtains information that gives it an understanding of the unique financial activity of its customers.  Likewise, TD Bank can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account.  This knowledge is used to identify unusual and suspicious transactions.

23.    TD Bank also makes employee compliance with applicable banking regulations and knowledge of AML guidelines a condition of employment and incorporates them into job descriptions and performance evaluations.  The bank gives AML training to all operational personnel whose duties may require such knowledge, including tellers and wire room personnel, to enable them to recognize indicia of money laundering and fraud in the course of their work.  In addition, supervisory personnel, specifically designated by TD Bank's chief compliance officer, oversee the day-to-day implementation of the bank's risk management framework at the individual branches.

24.    TD Bank's Code of Ethics and Business Conduct reinforces these compliance policies, stating that its employees are responsible to ensure that TD Bank does not "make entries to any account which are false, have not been properly verified, obscure the true nature of the transaction or allow such entries to be made . . ."  TD Bank's employees must also ensure that TD Bank does "not establish or operate, for any purpose, an account on the books of TD that cannot withstand the closest public scrutiny of its propriety."

25.    Complementing the human effort is TD Bank's advanced transaction monitoring software portfolio, which includes an artificial intelligence and data analytics software platform.

This software platform can reveal hidden connections and relationships between transacting parties across accounts and transactions.

26.    TD Bank's advanced transaction monitoring software portfolio automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior.  When the software identifies activity warranting further review or escalation, it alerts bank personnel.

27.    Moreover, the size, shape, and speed of NRIA's account activity strongly suggests that TD Bank assigned an account manager, relationship manager, or equivalent to NRIA.

28.    TD Bank permitted and at times facilitated NRIA and its agents' use of TD Bank accounts to carry out unlawful activity despite knowing that NRIA and its agents were abusing TD Bank's services including, but not limited to, by:

    a. Taking in large deposits obviously constituting deposits from investors and designated for investment purposes on their face;

    b. Transferring hundreds of thousands of dollars from those same accounts holding investor funds back to investors in routine sequence, which obviously constituted interest or distribution payments;

    c. Frequently over drafting those same accounts which held investor funds by substantial margins and replenishing the shortfalls with infusions of new investor funds; and

    d. Disbursing funds for non-legal purposes such as the commingling and misappropriation of investor funds into the coffers of NRIA's principals, their families, and affiliates.

29.    Many of NRIA's transactions were in large, round number, and often-repeated dollar amounts, a transfer pattern indicative of money-laundering activities.

30.    This was all done without indicators of normally-expected activity in the bank accounts of a legitimately and lawfully functioning real estate investment company.

31.    The account activity and account statements visible to TD Bank reflected these improper transactions using investor funds by NRIA and its agents.

32.    The account activity was also visible in the context of NRIA's agents' backgrounds. Specifically, NRIA's Senior Independent Executive Advisor and Portfolio Manager and "shadow CEO", Thomas Salzano ("Salzano"), was previously the subject of a Federal Trade Commission ("FTC") lawsuit in connection with Salzano's role atop a telecommunications services company. The FTC alleged Salzano engaged in false and misleading tactics to deceive consumers and the suit resulted in a $50,000,000 judgment against Salzano.  Salzano also pled guilty to five counts of theft in connection with the scheme.

33.    This was of no concern to TD Bank, who served as NRIA's primary bank despite Salzano's public and known background and despite the fact that in mid-2019, Salzano remarkably tried to defraud TD Bank by presenting a forged standby letter of credit in connection with a loan application. Even this, which TD Bank investigated and stated to Salzano had "many characteristics of fraud," did not deter TD Bank from continuing to bank for NRIA.

34.    Likewise, TD Bank stood by as NRIA's banker for several months *after* Salzano was arrested in May 2021 in connection with his presentation of a forged document to a prospective investor.

35.    Despite being privy to these and other signs of wrongdoing set forth in more detail herein, TD Bank did not terminate its relationship with NRIA or take steps to stop its fraudulent scheme.

36.    Instead, TD Bank continued to serve NRIA and facilitate improper transfers of investor funds that allowed NRIA to continue to operate its scheme for many years.

37.     TD Bank knew NRIA was using its TD Bank accounts for improper purposes but allowed NRIA to pay purported "interest" or "distributions" which was in fact just new investor money and allowed NRIA's principals and their relatives and affiliates to enrich themselves through direct payments from TD Bank accounts (at times to or through other TD Bank accounts) and through other self-dealing and insider transactions detailed herein.

## JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds $13,000,000 in the aggregate, exclusive of interest and costs, and the number of claimants exceeds 2,000 persons.

39.     This Court has personal jurisdiction over TD Bank because TD Bank maintains its principal place of business in New Jersey.  As such, TD Bank has purposefully availed itself of and established minimum contacts with the State.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as Defendant's unlawful course of conduct occurred in large part in this District.

## THE PARTIES

41.     Plaintiff Andrea Knoll ("Knoll") is, and was at all relevant times, a citizen of the State of Florida and currently resides in that State.  As set forth in greater detail herein, on or about July 27, 2020, Knoll began investing in NRIA.  In total, between 2020 and 2021, Knoll invested a total of $600,000 in NRIA.

42.     Defendant TD Bank is a financial services company based in Cherry Hill, New Jersey.

## FACTUAL ALLEGATIONS

### I.    Background of NRIA and the NRIA Fund

43.    NRIA was a New Jersey LLC formed in 2006. Rey Grabato, II owned 80% of NRIA and Daniel O'Brien owned 20% of NRIA.

44.    The NRIA Fund was a Delaware LLC formed in 2018.  According to NRIA Fund offering documents, NRIA managed the NRIA Fund.

45.    Beginning in or around 2016, NRIA began widespread solicitation of investments in the purchase, finance, and co-development of real estate.

46.    Beginning in or around 2018, the NRIA Fund dramatically increased the scale of its investment offerings.  From February 2018 through January 2022, the NRIA Fund raised approximately $650 million from over 2,000 investors.  Many of these investors were retirees and/or main street retail investors, and almost $100 million of the funds raised came from retirement accounts.

47.    NRIA ran nationwide radio and television advertisements, as well as erecting locally notorious billboards located at the entrances to Lincoln and Holland tunnels that touted "Returns Up to 21%".

48.    Investors received monthly distributions, typically between 6-10% per annum, the payment of which was facilitated by TD Bank from NRIA's accounts at TD Bank.

49.    By 2021, NRIA publicly claimed to have $1.25 billion under management and that the NRIA Fund was a billion-dollar real estate development operation.

### II.    The individuals behind NRIA, and TD Bank's decision to serve as their primary banking institution despite previous misconduct

50.    Rey Grabato, II ("Grabato") held the title of President and CEO of the NRIA Fund. Grabato was a signatory on the majority of NRIA's TD Bank accounts.

51.     Thomas Salzano held the title of "Senior Independent Executive Advisor and Portfolio Manager" of NRIA.  However, Salzano played a much larger role acting as "shadow CEO," overseeing all NRIA investment offerings and controlling the NRIA Fund's day-to-day activities.

52.     Salzano's true role within NRIA was concealed so as to avoid scrutiny of his past misconduct.  Specifically, in 2006, the Federal Trade Commission ("FTC") sued Salzano individually and as an officer of NorVergence, Inc. ("NorVergence"), alleging that Salzano made material misrepresentations and omissions to consumers in connection with the sale and financing of telecommunications services. *See FTC v. Salzano, et al.*, 06-cv-02883 (D.N.J., Complaint filed June 26, 2006).  Salzano ultimately entered into a Stipulated Permanent Injunction and Order that enjoined such misconduct and imposed a $50 million judgement, which was suspended. *Id.* (Order entered June 29, 2006).

53.     In addition, NorVergence was forced into involuntary bankruptcy.  In connection therewith, the United States Bankruptcy Trustee commenced an adversary proceeding against Salzano alleging Salzano engaged in fraudulent transfers, conversion, misappropriation, unjust enrichment, breach of fiduciary duty, and fraud. *See In re: NorVergence, Inc.*, 04-bk-32079 (Bankr. D.N.J., Complaint filed July 14, 2006).

54.     Three years later, Salzano was indicted by a Louisiana grand jury on three counts of money laundering, four counts of conspiracy to commit money laundering, and four counts of theft in connection to the NorVergence scheme.  In 2013, Salzano pled guilty to five counts of theft.

55.     As if that were not enough, in 2017, the IRS effectuated a levy against Salzano for unpaid income tax and assessments on one of Salzano's accounts at TD Bank.

56.     Salzano's wife, Olena Budinska ("Budinska"), maintained a sham position with the NRIA Fund.  Financial records list Budinska's occupation as "baby sitter".

57.     Arthur Scuttaro ("Scuttaro") was NRIA's Executive Vice President of Project Management and was head of sales and an "Advisor" to the NRIA Fund.  Notably, Scuttaro previously served as Senior Vice President of Application Screening at NorVergence.

58.     Daniel O'Brien ("O'Brien") was the NRIA Fund's Co-CIO, and he was the sole owner of two other entities involved in NRIA's scheme: NRIA Capital Partners, Inc., a New York corporation, and 44 Capital Management Corp., a New Jersey corporation.  O'Brien was in charge of managing NRIA's portfolio of commercial mortgage-backed securities, discussed in more detail herein.

**III.    NRIA's misrepresentations and omissions to investors and the underlying scheme**

59.     Contrary to offering materials, the NRIA Fund's distributions did not come from cash flow derived from NRIA's real estate ventures.  Rather, from inception through June 2021, the majority of NRIA Fund distributions were paid using investor funds.

60.     Despite the making of these distributions, the NRIA Fund had no revenue and no net income for the period of inception through June 30, 2020.

61.     NRIA grossly inflated its revenues in financials it disseminated to investors by improperly recording project fees and development fees as income at the outset of its real estate projects.

62.     By misrecording these fees, NRIA was able to overstate its income by 582% in 2018, 1227% in 2019, and 4653% between January and June 2020.

63.     The NRIA Fund's website exclaimed "We're Paid Last – After You."  However, on some occasions, NRIA took a near-10% fee at the outset of its real estate projects.

64. NRIA boasted that it invested $60 million of its own money in the NRIA Fund. This was false.

65. NRIA and its agents also did not disclose that NRIA was diverting investor funds to themselves, their families, and affiliated companies.

66. NRIA and its agents also did not disclose the prior civil and criminal fraud charges involving NRIA's principals, or that they were using investor funds to finance efforts to conceal such charges from public view.

67. Some investors and prospective investors feared NRIA may be a Ponzi scheme. Investor inquiries on this subject became so frequent that NRIA had a scripted response for its sales team to assuage investor concerns.

## IV.    The TD Bank accounts

68. In February 2007, Salzano opened a TD Bank account in the name of Rey Grabato, LLC. Salzano was the sole signatory on this TD Bank account. At some point thereafter, TD Bank issued Salzano a debit card for the Rey Grabato, LLC account.

69. The Rey Grabato, LLC account would go on to receive millions of dollars of NRIA investor funds, which Salzano misappropriated for his personal benefit.

70. In February 2016, Grabato opened a TD Bank account in the name of Land Net, LLC. Grabato was the sole signatory on this TD Bank account. At some point thereafter, TD Bank issued Grabato a debit card for the Land Net, LLC account.

71. In June 2017, Grabato closed that account and in September 2017, opened another TD Bank account in the name of Land Net, LLC. Again, Grabato was the sole signatory. At some point thereafter, TD Bank issued Grabato a debit card for the second Land Net, LLC account.

72.     Later on and during the relevant time period, NRIA maintained several other accounts with TD Bank, two of which were primarily used to receive and disburse investor funds. One such account was the 1872 Account, another was an account ending in 1803 (the "1803 Account"). Grabato opened the 1872 Account in November 2018.

73.     From 2018 to 2022, approximately $8 million of investor funds was deposited into the 1803 account. These funds were frequently commingled with the 1872 Account.

74.     At some point, the 1872 Account became the primary account through which NRIA funneled its business. The source of funds in this account was primarily investor funds, which were transmitted via wire and check deposits.

75.     At some point, NRIA opened additional TD Bank accounts in the name of other LLCs, including National Realty Project Managers LLC (the "1746 Account") and NRIA PPF1 (the "7438 account").

76.     Often, investor funds were deposited into one of the various TD Bank accounts referenced above, before being transferred into the 1872 Account, from which TD Bank facilitated the transfer of investor funds into the coffers of NRIA's principals.

**V.      Improper TD Bank transactions involving investor funds**

77.     The hallmark of a Ponzi scheme, NRIA frequently used new investor funds to pay distributions to existing investors. In fact, aside from intake and outflow of investor funds, NRIA earned and collected almost no revenue for most of its existence.

78.     For example, from March through June 2018, the 1872 Account received $904,407 in contributions from investors. During the same time period, the 1872 received no other deposits, yet NRIA used the 1872 Account to pay $138,513 in investor distributions.

79.    Likewise, NRIA's various TD Bank accounts often amassed substantial negative balances.  NRIA would replenish these accounts with new investor funds.  The following are exemplars of this practice:

    a.  In May 2019, after making distributions to investors, one TD Bank account had a negative balance of approximately $29,000.  The shortfall was rectified by an infusion of new investor funds and a loan.

    b.  In October 2019, after making another round of distributions to investors, that same TD Account had a negative balance of approximately $136,000.  The shortfall was replenished by two new investors who collectively invested $200,000.

    c.  In November 2019, that same TD Account had a negative balance of approximately $485,000, which was once again rectified with new investor deposits one week later.

80.    In addition, NRIA transferred substantial funds to its own principals or for their benefit through its TD Bank accounts:

    a.  On or about April 30, 2018, Grabato made a mortgage payment on a townhome and lease payment on a luxury vehicle from the 1803 Account.

    b.  On or about June 9, 2019, Grabato made a lease payment on a luxury vehicle from the 1872 Account.

    c.  On or about July 12, 2019, Grabato and Salzano caused a check drawn from the 1872 Account in the amount of $5,000 to be deposited into a TD Bank account belonging to Salzano's wife.

    d.  On or about October 14, 2019, Grabato made a mortgage payment on a townhome from the 1872 Account.

    e.  On or about June 30, 2021, Grabato deposited a check for approximately $420,000 from the 1872 Account in his personal account at another bank.

    f.  At least $4.2 million of investor funds were transferred to Grabato's personal bank accounts and bank accounts he controlled.

    g.  Likewise, O'Brien received approximately $6.7 million in investor funds through NRIA Capital Partners, Inc. and 44 Management Corp., two entities he owned and controlled.

    h.   Scuttaro received nearly $540,000 in investor funds during the month of June 2021 alone.

81.    Millions of dollars of investor funds were transferred to Salzano's wife and sham NRIA employee, Budinska:

    a.   The NRIA Fund paid Budinska at least $222,000 in 2018.

    b.   The NRIA Fund paid Budinska at least $300,000 in 2019.

    c.   The NRIA Fund paid Budinska at least $291,000 in 2020.

    d.   The NRIA Fund paid Budinska at least $1.3 million in 2021.

    e.   Grabato initiated approximately $300,000 in transfers from TD Bank accounts holding investor funds to Budinska.

    f.   On July 1, 2021, Grabato transferred $420,000 from the NRIA Fund to Salzano by personal check, which was subsequently endorsed and deposited by Budinska into her personal account at TD Bank.

82.    NRIA also, at least in part through its TD Bank accounts, made payments to various relatives and affiliates of NRIA principals as follows:

    a.   The NRIA Fund loaned approximately $780,000 to U.S. Construction, which was partially owned by Salzano's son, Dustin.

    b.   The NRIA Fund paid Bethany Salzano at least $1.8 million between 2018-2021 through her company Referral Marketing Associates, LLC for an office job for which she lacked experience and credentials.

    c.   The NRIA Fund paid Scuttaro's brother $2.2 million through his company SAV Consulting.

    d.   The Fund paid Scuttaro's other brother $370,000 through his company T3X Consulting, LLC.

    e.   The Fund paid over $200,000 to Link N' Log Design and Website Consultants, which was owned by Salzano's son-in-law, Kyle Safirny, who also served as NRIA's Vice President of Information Technology.

    f.   NRIA purchased and leased equipment from Peter Salzano's company Network Digital.

g.  Salzano's relative Thomas received commissions in connection with the sale of NRIA properties as a real estate agent.

h.  Despite telling investors it did not pay referral fees to gain new investors, NRIA paid at least one marketing firm more than $200,000 of referral fees.

83.    Moreover, between May 2019 and February 2021, NRIA transferred at least $440,000 of investor funds from its TD Bank accounts to Web Marketing (which also banked at TD Bank), Ably Soft Private Limited, FATbit Technologies, and others for the purpose of creating decoy websites, altering online search results, and diverting attention from Salzano's and Scuttaro's sordid pasts.

**VI.    Salzano attempted to defraud TD Bank *(his own bank)*, yet TD Bank continued to serve as NRIA's primary banking institution**

84.    In May 2019, in connection with a loan application for a real estate project, Salzano presented TD Bank with a forged Standby Letter of Credit ("SBLC") that purported to show $20 million guaranteed by Deutsche Bank.

85.    In order for TD Bank to approve Salzano's loan application, TD Bank required a SWIFT message guaranteeing that Deutsche Bank had reserved the $20 million in question.

86.    In connection therewith, Salzano provided TD Bank with what he claimed was Deutsche Bank's identifying information, but TD Bank discovered and informed Salzano that the identifying information was insufficient.

87.    On May 10, 2019, TD Bank informed Salzano and Grabato that contrary to Salzano's representations, Deutsche Bank in fact had not issued the SBLC.

88.    Salzano doubled down and sent TD Bank at least two more forged SWIFT messages.

89.    TD Bank then conducted an investigation into the SWIFT messages provided by Salzano.   In connection therewith, TD Bank confirmed that the messages were not sent by Deutsche Bank and TD Bank knew that the messages possessed "many characteristics of fraud."

90.    Finally, Salzano presented the implausible excuse that his e-mail account was hacked.

91.    In response, TD Bank did not close any of NRIA's or its principals' or affiliates' accounts and took no action beyond denying the loan at issue.

**VII.    Salzano was arrested and charged with fraudulent conduct in connection with soliciting NRIA investments, yet TD Bank continued to serve as NRIA's primary banking institution**

92.    In January 2019, Salzano attempted to induce an NRIA investor to increase her investment by fabricating a story about Genesis Capital, a reputable real estate lender, providing financing for a particular NRIA project.

93.    In furtherance of that fabrication, Salzano presented the investor with a term sheet purportedly signed by the CEO of Genesis Capital agreeing to provide $25 million in financing for the project.

94.    This representation was not true, and precipitated Genesis Capital sending NRIA a Cease and Desist letter.

95.    Salzano tried to allay the investor's and Genesis Capital's concerns, characterizing his use of the forged term sheet as a mistake and a misunderstanding.

96.    On March 4, 2021, Salzano was arrested and criminally charged with fraud and aggravated identity theft.

97.      Despite this, Salzano continued to play an active management role in the NRIA Fund until October 2021.  During this time, Salzano continued to receive payments which were facilitated by TD Bank from NRIA's accounts at TD Bank.

**VIII.    NRIA engaged in self-dealing transactions to prop up its unlawful and failing business**

98.      Between July 2019 and January 2021, the NRIA Fund loaned at least $4 million of investor funds to Web Marketing, a company run by Grabato's cousin.  Grabato even paid the business entity formation fee to create the company.

99.      Specifically, and not by way of limitation, on October 31, 2019, two transfers of $371,013.24 and $398,692.24 were made from the 1872 Account to a TD Bank account controlled by Web Marketing (the "5906 Account").

100.     Web Marketing proceeded to wire funds to a title company to cover the purchase of two properties by the Summer Ave Trust, an entity Web Marketing created that same month.

101.     The beneficiary of the Summer Ave Trust was Realty Holding Trust 3314, which was controlled by Grabato.  The successor trustee of the Summer Ave Trust was Budinska.

102.     Unbeknownst to investors, *Grabato* proceeded to sell the two properties to the Summer Ave Trust, of which his own company was beneficiary, for $389,900.  This created the appearance that the NRIA Fund was successfully selling condominium units.

**IX.     NRIA's decline**

103.     In 2020, NRIA invested approximately 25% of investor funds in low-grade commercial mortgage-backed securities (otherwise known as "junk bonds") and leveraged the securities through repurchase agreements with various financial institutions.

104.     NRIA's leveraging of the purchases magnified the risks associated with these junk bonds, the consequences of which were never disclosed to investors.

105.     NRIA pursued this course of action in a last-ditch effort to generate the returns it promised to its investors, but it was woefully unable to deliver.

106.     Finally, in September 2021, TD Bank ended its banking relationship with NRIA.

107.     Ultimately, on June 7, 2022, NRIA and its family of entities petitioned for Chapter 11 bankruptcy protections. *In re: National Realty Investment Advisors, LLC*, Case No. 22-bk-14539 (Bankr. D.N.J., Petition filed June 7, 2022).

## X.     Regulators descend on NRIA

108.     On June 21, 2022, the New Jersey Bureau of Securities ("NJBS") issued a Summary Cease and Desist Order following an investigation into NRIA's Ponzi-like operations.

109.     During its investigation, the NJBS deposed Grabato and O'Brien, who asserted their Fifth Amendment privilege against self-incrimination a combined 700 times.

110.     On October 13, 2022, the SEC filed a civil enforcement action against NRIA, Grabato, O'Brien, Salzano, and Scuttaro, alleging "Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]." *SEC v. National Realty Investment Advisors LLC, et al.*, Case No. 22-cv-06066 (D.N.J., Complaint filed Oct. 13, 2022).

## XI.     Plaintiff's investments in NRIA

111.     Plaintiff learned of NRIA through its marketing, specifically its radio advertising.

112.     In 2020, Plaintiff invested in the NRIA Fund. Plaintiff completed the investment by wiring $100,000 to the 1872 Account on July 27, 2020.

113.     Plaintiff proceeded to make four more investments in NRIA, as follows:

a.     Plaintiff wired $50,000 to the 1872 Account on September 25, 2020.

b.   Plaintiff wired $133,000 to the 1872 Account on February 5, 2021.

c.   Plaintiff wired $67,000 to the 1872 Account on April 22, 2021.

114.   Plaintiff's final NRIA investment was made through an LLC she controls with her husband called Sommer Services, LLC ("Sommer Services").  Plaintiff completed the investment by wiring $250,000 to an NRIA account at Valley National Bank on October 13, 2021.

## XII.   TD Bank's material participation in the sale of NRIA's securities

115.   TD Bank served as NRIA's and its affiliates' primary banking institution. Specifically, TD Bank facilitated the opening of many TD Bank accounts owned and controlled by NRIA, its affiliates, and its principals.

116.   As the custodian of these bank accounts, TD Bank knew these bank accounts held investor funds.

117.   In addition to opening and maintaining NRIA's TD Bank accounts, TD Bank facilitated the transfer of monthly distribution payments to NRIA's investors.  TD Bank knew that the funds it was distributing to existing investors were coming from accounts funded by new investor deposits.

118.   Similarly, TD Bank facilitated the transfer of investor funds to NRIA's principals and their affiliates.  As described in greater detail above, TD Bank facilitated the transfer of investor funds from TD Bank accounts that held investor funds to accounts controlled by Grabato, Salzano, Scuttaro, and others.

119.   TD Bank's participation was critical to the success of NRIA's sales of securities to Plaintiff and the class members.

## CLASS ACTION ALLEGATIONS

120.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

121.    Plaintiff brings this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class").

122.    Plaintiff proposes that the Class be defined as follows:

> Any person who invested in NRIA products including, but not limited to, the NRIA Fund, whose funds were held in accounts at TD Bank or who received disbursements from accounts at TD Bank between January 2016 and June 2022.

123.    Plaintiff reserves the right to amend this Complaint to assert claims on behalf of additional classes or subclasses of investors.

124.    Collectively, all the persons identified in the Class definition above will be referred to as "Class members."  Plaintiff represents, and is a member of, the Class.  Excluded from the Class are Defendant, any entities in which Defendant has a controlling interest, Defendant's agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.  Plaintiff does not know the exact number of members of the Class, but reasonably believes that there are at least 2,000 Class members.

125.    The joinder of all Class members is impracticable due to the number of Class members.  Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

126.    Plaintiff's claims are typical of the claims of the Class she seeks to represent. Plaintiff and other Class members invested in NRIA's offerings during the relevant time period.

127.    There are well-defined, nearly identical, common questions of law and fact affecting all parties that predominate over questions that may affect individual Class members including, but not limited to, the following:

> a.    Whether TD Bank materially aided NRIA in NRIA's perpetration of a Ponzi or Ponzi-like scheme;
>
> b.    Whether TD Bank knowingly aided NRIA in NRIA's perpetration of a Ponzi or Ponzi-like scheme;
>
> c.    Whether TD Bank acted negligently in servicing, maintaining, or simply allowing to exist NRIA's accounts held at TD Bank that were used to further a Ponzi or Ponzi-like scheme; and/or
>
> d.    Whether TD Bank was willfully or grossly negligent in servicing, maintaining, or simply allowing to exist NRIA's accounts held at TD Bank that were used to further a Ponzi or Ponzi-like scheme.

128.    These and other common issues predominate over any individual issues.  The focus of these claims is on the conduct of TD Bank which did not vary as between Class members. Resolution of these common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all Class members.

129.    For all these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

130.    Plaintiff and the Class members have been harmed and/or continue to be harmed by the foregoing and other acts of TD Bank including, but not limited to, the loss of funds invested in NRIA securities.

131.    Plaintiff seeks damages on behalf of herself and all Class members including, but not limited to, return of her invested funds with the interest promised, as well as consequential damages in an amount to be proven at trial.

132.    Plaintiff will fairly and adequately represent and protect the interests of the Class and has no interests which are antagonistic to any member of the Class.

133.    Plaintiff has retained counsel experienced in handling class action claims involving fraud and securities violations.  Plaintiff's counsel is also experienced in prosecuting the claims of investors against individuals and entities that have engaged in malfeasance with respect to investments.

134.    Class-wide relief is essential to resolve the claims regarding all potential investors relating to all responsible parties in an equitable, even-handed fashion.

135.    Plaintiff therefore seeks certification of the Class pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(3).

136.    Plaintiff seeks certification of a Rule 23(b)(1)(A) class.  Adjudicating Defendant's liability for the facts and claims alleged herein on an individualized basis poses a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant if a class is not certified.

137.    Plaintiff seeks certification of a Rule 23(b)(3) class.  As detailed above, common questions regarding Defendant's conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds or even thousands of individual cases involving the same core facts and claims addressed to Defendant's conduct.

138.    In the alternative, Plaintiff seeks certification of an "issues" class pursuant to Rule 23(c)(4).  This class would incorporate, allow for the adjudication of, all issues the Court adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiff in paragraph 127.

## CAUSES OF ACTION

### Count I
### *Aiding and abetting breach of fiduciary duty*

139.    Plaintiff alleges this cause of action on behalf of herself and the Class and, in doing so, incorporates by reference all preceding allegations.

140.    NRIA and its agents owed fiduciary duties to Plaintiff and the Class.  They owed a fiduciary duty in connection with the funds in the TD Bank accounts.  They also owed a fiduciary duty in connection with accepting funds to be used for investment purposes and they maintained control over those funds upon receipt.  In connection therewith, they owed duties of loyalty and care to and to deal honestly and in good faith with Plaintiff and the Class.

141.    As set forth above, NRIA and its agents breached those duties to Plaintiff and the Class by using Plaintiff's and the Class members' invested funds for purposes other than those represented or intended.

142.    TD Bank knowingly and substantially provided material assistance to the breaches of fiduciary duty owed to Plaintiff and the Class.  TD Bank knowingly allowed the TD Bank accounts opened by NRIA and its agents to be operated in a manner that bore no resemblance to how such accounts were appropriately used.

143.    TD Bank witnessed systematic, continuous evidence of fraudulent activity, yet took no action to stop the misconduct, and instead facilitated NRIA's continued operation and use of NRIA's TD Bank accounts to perpetrate the scheme.

144.    TD Bank substantially benefitted from its participation in the NRIA scheme.  The scheme caused TD Bank to earn substantial income from banking fees derived from NRIA's use of TD Bank as its primary banking institution.

145.    As a direct and proximate result of TD Bank's aiding and abetting of the breaches of fiduciary duty, Plaintiff and the Class have lost a significant portion of the funds they invested with NRIA, have been denied the use of their assets, and have been damaged thereby in an amount to be determined at trial.

**Count II**
*Aiding and abetting fraud*

146.    Plaintiff alleges this cause of action on behalf of herself and the Class and, in doing so, incorporates by reference all preceding allegations.

147.    As set forth above, by promoting real estate investment opportunities with no intention of delivering on its representations, and instead laundering the investment funds through the TD Bank accounts and misappropriating them for their own personal use, NRIA and its agents committed fraud.

148.    NRIA and its agents intentionally misrepresented and omitted material facts in connection with the sale of real estate investment interests.  Plaintiff and the Class reasonably relied to their detriment on such representations and omissions in purchasing such investments, and in their absence would not have made those purchases.

149.    TD Bank knowingly and substantially provided material assistance to the fraud. TD Bank knowingly allowed the NRIA accounts at TD Bank to be operated in a manner that was a Ponzi or Ponzi-like scheme that had no resemblance to how real estate investment company accounts are appropriately used.

150.    TD Bank knew that the NRIA accounts had been created for real estate investment-related purposes, yet facilitated the systematic and continuous commingling, laundering, and misappropriation of investor funds.

151.    TD Bank took no action to stop the misconduct, and instead permitted and facilitated the account activity at issue.

152.    TD Bank substantially benefitted from its participation in the NRIA scheme.  The scheme caused TD Bank to earn substantial income from banking fees derived from NRIA's use of TD Bank as its primary banking institution.

153.    As a direct and proximate result of TD Bank's aiding and abetting of the breaches of fiduciary duty, Plaintiff and the Class have lost a significant portion of the funds they invested with NRIA, have been denied the use of their assets, and have been damaged thereby in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all Class members the following relief against Defendant:

I.    For all recoverable compensatory and other damages sustained by Plaintiff and the Class;

II.    For the rescission of all investments made by Plaintiff and the Class through Defendant;

III.    For an award of attorneys' fees and costs to counsel for Plaintiff and the Class to the extent permitted by applicable law;

IV.    For an order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class; and

V.    For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

Dated: March 29th, 2023

/s/ Mark J. Astarita
Mark J. Astarita (N.J. Bar No. 028791981)
**SALLAH ASTARITA & COX**
60 Pompton Ave
Verona, NJ 07044
Telephone: (973) 559-5566
E-Mail: mja@sallahlaw.com

**PEIFFER WOLF**
Daniel B. Centner (*pro hac vice* forthcoming)
Grace A. Van Hancock (*pro hac vice* forthcoming)
1519 Robert C. Blakes Sr. Drive,
New Orleans, Louisiana 70130
Telephone: (504) 605-2235
Facsimile: (504) 608-1465
E-Mail: dcentner@peifferwolf.com
E-Mail: gvanhancock@peifferwolf.com

**SILVER LAW GROUP**
Scott L. Silver (*pro hac vice* forthcoming)
Ryan A. Schwamm (*pro hac vice* forthcoming)
Peter M. Spett, Of Counsel (*pro hac vice* forthcoming)
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone: (954) 755-4799
Facsimile: (954) 755-4799
E-Mail: ssilver@silverlaw.com
E-Mail: rschwamm@silverlaw.com
E-Mail: pspett@silverlaw.com